## STATE OF VERMONT

**SUPERIOR COURT**
Windsor Unit

**CIVIL DIVISION**
Docket # 521-8-12 Wrcv

JAMES C. FOX and
MARY JANE FOX

v.

TOWN OF BRIDGEWATER

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

This property tax appeal came before the Court for a final hearing on October 25 and 30 and December 5, 2013. A site visit was taken on the first day prior to taking evidence. Appellant James Fox ("Appellant" or "Mr. Fox") represented himself. The Town of Bridgewater (the "Town" or "Bridgewater") was represented by Attorney Robert E. Fletcher.

The Court ruled at the close of Appellant's evidence that Appellant had produced sufficient evidence to overcome the presumption of validity of the Town's valuation of the property, and proceeded to take evidence from the Town as well as rebuttal evidence from the Appellant.

The Appellant challenges the Town's position that on April 1, 2012 the highest and best use of this 4-acre parcel of vacant land was as a developable building lot, and seeks a finding that its highest and best use was as vacant land with limited forestry value. The values advocated by each party correspond to that party's position on highest and best use. Based on the findings of fact and the conclusions of law set forth below, the Court concludes that the property does not have a sole highest and best use, but has a mixed highest and best use: it has limited potential as a developable lot, with recreation and forestry as a more likely use. Based on this determination, and for the reasons set forth below, the Court sets the fair market value at $30,000 and the equalized value at $29,400.

### Findings of Fact

The property consists of 4 acres and is a triangle located at the intersection of Latham Road and Perkins Road in Bridgewater. It is in a part of Bridgewater that is characterized by large estate-type properties including neighboring properties owned by current or former corporate executives of large national companies. It is largely wooded and is surrounded by other wooded land as well as open land that rises in elevation on the

FILED

JAN 23 2014

VERMONT SUPERIOR COURT
WINDSOR UNIT

eastern side. The portion near the intersection of the two roads is relatively flat. A fairly narrow strip of land along Perkins Road (the east boundary and the hypotenuse of the triangle) rises at an average grade of 14% in a northerly direction, but west of the narrow strip the land drops down a bank. On the Latham Road side, the frontage is low and wet, and a stream runs through the property and under Perkins Road through a culvert.

Most of the property is at the base of a bowl into which surrounding higher lands drain. The Vermont Agency of Natural Resources maintains a website with a map showing the Vermont Significant Wetland Inventory. It shows a large circle of yellow overlaying a significant majority of the parcel, and the legend identifies the yellow circle as "Class II Wetland." Exhibit 7. The wetland designation does not front either Perkins Road or Latham Road. The Vermont Wetland Rules prescribe a 50' buffer zone contiguous to the boundaries of a Class II wetland unless otherwise designated by the Secretary of ANR. Exhibit 17, Vermont Wetland Rules, effective August 1, 2010 at 10.

Another page of the Natural Resources Atlas shows hydric soils between the yellow circle designating wetlands and the intersection of Perkins and Latham Roads. Exhibit 21. Hydric soils are "soils that are saturated, flooded or ponded long enough during the growing season to develop anaerobic conditions in the upper part . . . hydric soils shall be synonymous with the terms saturated soils and seasonally saturated soils as used in 10 V.S.A. Sec. 902(5)." *Id.* at 6.

The ANR website contains disclaimers stating that the information displayed is approximate and that the data is not survey quality and should not be relied on for precise location:

> This Vermont Significant Wetland Inventory (VSW) Map should not be relied upon to provide precise information regarding the location or configuration of significant wetlands. This map is intended only to denote the approximate location and configuration of significant wetlands. The actual boundaries of the wetlands depicted on this map must be determined in the field by Agency of Natural Resources (ANR) staff.

Exhibit 18.

Bridgewater has no zoning, so there are no restrictions on development of the parcel except for State regulations applicable to the location of septic and water systems, and wetlands restrictions. Allowed uses in Class II wetlands include activities such as silviculture, road and utility repair, specified recreational activities, and wildlife management. (See Exhibit 17, pages 19-21 for a more complete and specific list.)

The Town assessed the parcel based on a highest and best use of development as a residential building lot. It values the first two acres of all vacant land in the Town as a potential residential building lot. The Town presented evidence of value based on this highest and best use from two witnesses: Lister Thomas Standish, who valued the property at $63,300, and Kevin Leen of Vision Government Solutions, a company that

2

performs mass appraisals for municipal governments, who valued the property at $61,000.

The determination of highest and best use was made by the Listers, and was simply adopted by Mr. Leen and not reevaluated by him when he appraised the parcel. Thus, the evidence of highest and best use came from Mr. Standish alone. His testimony was that the first two acres of all vacant land parcels in Bridgewater are presumed to be developable building lots, and that Appellant in this case has not proved that the parcel is not developable. The Town's position is that because Appellant's evidence shows that a mounds waste disposal system could be located on the non-wetlands portion of the property sufficient to serve a 2-bedroom residence, the owner has not shown it is not developable, and therefore it is valued as a developable building lot.

He noted that the Listers made an adjustment from the base land value[1] for a homestead, which is $32,000 per acre, by applying a 25% reduction based on the physical features of the land.[2] Another adjustment was applied by multiplying the value by 1.4 based on the desirability of the neighborhood, thereby increasing the value by 40%. These adjustments, together with another one to more accurately reflect actual sales values, produced a value of $54,900 for the 2-acre homestead plus $8,400 for the additional 2 acres for a total value of $63,300. Thus, the Town's position is that an adjustment was made to reflect the wetness conditions of the land, but that use of the parcel as a developable lot is not precluded, and that the wetness characteristics that affect development have been taken into account. The Town's evidence did not include a factual or quantitative basis for either the 25% reduction for property characteristics or the 1.4 upward adjustment for desirability of neighborhood.

Mr. Leen's appraisal opinion of $61,000 was based entirely on the Town's identification of the highest and best use as a developable building lot, without adjustment for any characteristics of the specific parcel. He took land value from the updated 2012 land schedule, identified three sales of properties he considered comparable except that all had improvements on them, subtracted the value of the improvements on each to identify a range from $44,000 to $69,000, and reconciled them at $61,000.

Appellant introduced no evidence to challenge the Town's evidence of the fair market value of the property if highest and best use is determined to be as a developable building lot. His evidence was that highest and best use is not as a developable building lot but rather for nondevelopment uses such as forestry or recreation. His expert appraiser, Sean Sargeant, relied on opinions in two engineering studies that "development of the site is limited by hydric soils and a wetland and it could not support a standard septic system to state requirements." Exhibit 11. Thus, his opinion was based on the premise that the property could not be developed at all and he valued it on that basis at $15,000.

---

[1] Base land values were taken from the land schedule developed in 2007 during a Town-wide reappraisal and were updated by applying statistical adjustments to arrive at values for 2012.
[2] The Listers' card, Exhibit D, includes a note from 4/07 that reads "Lot has run-off collection issues."

FILED

JAN 2 3 2014

VERMONT SUPERIOR COURT
WINDSOR UNIT

3

*Highest and Best Use*

There was considerable evidence presented at the hearing about the characteristics of the property and their impact on highest and best use. Two pieces of evidence are particularly important to the determination of highest and best use.

The first is Appellant's testimony that on August 17, 2012, Alan Quackenbush, Wetland Specialist from the Water Quality Division of the State of Vermont Agency of Natural Resources, visited the property with Appellant and Consulting Engineer Blair J. Enman. Mr. Quackenbush made an informal delineation of the wetland area on the parcel, including marking it with stakes and surveyor tape, some of which was visible on the site visit. The second is the results of the investigation and analysis done by Mr. Enman of the feasibility of locating a waste disposal system on the property for purposes of development.

With respect to the informal delineation of wetlands made by Mr. Quackenbush, there is no question that it was not a formal study and did not produce survey-quality information that conclusively establishes boundaries of wetlands and buffer zones on Appellant's property. It appears to be the Town's position that because the delineation was informal the information is not reliable. The Town will not accept the delineation and the related restrictions they signify as having an effect on highest and best use unless and until Appellant undertakes to have a formal study completed and submitted. Based on the testimony of Mr. Fox and Mr. Enman, the cost of such a study is likely to be in the range of $1,300 to $3,000.

In this case, the information made available as a result of having a State Wetland Specialist walk the property and do an informal delineation of its wetlands is relevant, useful, and reliable information at the level it was provided. While the exact lines of the informal delineation are not known, there is sufficient evidence for the Court to find that a significant portion of the Appellant's property is either wetlands or a related buffer, and that while this condition does not preclude the possibility of development on a small non-wetlands portion of the parcel, it has an effect on potential development and thus is an important factor in determining the highest and best use of the property. The information was at a sufficient level of accuracy to be relied on by Mr. Enman in doing his study described below.

The second important piece of evidence is the testimony and opinion of Mr. Enman. He is a professional engineer with significant experience in designing waste water systems and potable water systems. He is not a wetland engineer, but accompanied Mr. Quackenbush during the informal wetlands delineation in August of 2012 and was thereby able to acquire first-hand reliable information about the existence and extent of wetlands on Appellant's property, which he used in his own work. He has worked with Mr. Quackenbush over many years and "has never seen him wrong." He was retained by

4

Appellant to render a professional opinion regarding the capacity of the property for development for residential purposes. As part of his evaluation, he excavated four test pits on the property and took field measurements. The Court finds his opinions as an expert are well-grounded in proven facts and supported by explanations based on his special knowledge, training, and experience as a professional engineer who focuses on waste and water systems for land development.[3]

His opinions are:

1. That "the area available for a the [sic] siting of a wastewater system is most minimal.
2. That the property cannot support a wastewater disposal system suitable for more than a 2-bedroom single family residence, as it lacks available area for the trench length necessary for a 3-bedroom dwelling.
3. That it cannot support a traditional waste water system because there is not sufficient area for a replacement system.
4. That under current rules that allow for a "mounds" system rather than a traditional system, a replacement system is no longer necessary so a mounds system could be installed, but the site does not meet the design criteria for a "prescriptive" (cookbook) mounds system, so a "performance based mound design" would be required.
5. A performance based mound design "does not provide the safety factor associated with the Prescriptive Design. . .In essence, there is no safety factor remaining. Any rise in the seasonal water table closer to the ground surface will tend to push the effluent mounding at the toe of the mound even closer to ground surface. If surfacing occurs, the mound would be labeled as failed. This occurrence cannot be ruled out." Exhibit 5. Moreover, overload of a small system (i.e., for a 2 bedroom house) is more likely than for a larger dwelling (e.g., 4-5 bedrooms), resulting in failure.
6. If the mound system failed, there is no viable alternative as there is no room for a replacement system.
7. Failure of a prescriptive mound system could result in "a long term pump and haul requirement issued by the state. This will have significant impact on the future value of the property and any constructed improvements." *Id.*
8. "[T]he property is better left undeveloped as there is no viable alternative in the event the mound system fails." *Id.*
9. Even if a permit could be obtained to install a prescriptive mound design, the siting of a well requires minimum isolation distances from the wastewater system as well as from the wetland and associated buffer, and no analysis has yet been done to determine whether there is enough land area available to meet the

---

[3] His firm has more than 30 years of experience and offers services including "studies, design, and permitting services for Land Use Planning & Land Development, Environmental Permitting, Stormwater Management Systems, Wastewater Disposal Systems, Water Supply Systems, Engineering Surveys, Act 250 Permitting, Municipal and State Permitting, Phase I Environmental Site Assessments, Hydraulic Pumping Systems, and Expert Witness Services & Testimony." Exhibit 1.

FILED

JAN 23 2014

VERMONT SUPERIOR COURT
WINDSOR UNIT

requirements necessary to install a well; Mr. Enman pointed out on an exhibit a very small area that was the only place available for both a house and well.

10. Even if a permit could be obtained to install a prescriptive mound design, there are problems with respect to locating a house site. "There is no area available for the siting of the house uphill or downhill of the proposed wastewater disposal system." *Id.* "The area available for a dwelling diminishes further to the south." *Id.* There is only a very small area that could be eligible for a house site, if the lot can accommodate one at all. There would be a "much higher hurdle" if the house must be located within the wetland buffer.

In short, his opinion is that while it is conceptually possible to obtain a wastewater permit for a performance mound design, any dwelling would be limited to 2 bedrooms; it is not yet clear whether there is room for or permission could be obtained for a well and house in addition to the mound system; and there are significant environmental risks associated with installing a prescriptive mound system on the property because of the possibility that it would fail and trigger wetlands violations and enforcement consequences. Mr. Enman's testimony, which is credible and is found as fact by the Court, is that a mounds system would cost $25,000-30,000, and a well would likely cost $5,000-9,000. His opinion is that the available usable land is too small to accommodate all three necessary components for a developed lot: a waste water disposal system, a well, and a dwelling.

These opinions constitute highly significant information affecting the highest and best use of the property. While it remains a possibility that someone could buy the parcel for development purposes, any buyer would have to invest considerable funds into first determining *whether* the land could be developed: the cost of a formal study to delineate the boundaries of the wetlands and buffers, the cost of determining whether a well could be sited on the property, and the cost of determining whether and where a dwelling could be sited on the land. Even then, the buyer would be severely limited as to where to site a structure, and would be limited to a structure with only 2 bedrooms.

Thus, while it is not definitive that the property cannot be developed, the facts show that the costs and limitations associated with development are very significant—so significant that they render the development potential low. Why would a potential buyer looking to build a residence in Bridgewater—even one who only wanted 2 bedrooms-- choose this property, with all its extra costs and risks, over a site that did not entail such significant development costs and potential environmental risks? It does not have compensating amenities, such as a splendid view. It is hard to imagine that being in a neighborhood where corporate executive have estates would be sufficient to overcome the effect of a cost-benefit analysis that shows high investment costs versus the risks of not being able to obtain legal permission at all and/or the risk of a wastewater failure and related environmental enforcement liability.

For these reasons, the facts do not support a sole highest and best use determination of residential development. At the same time, the facts do not support a finding that the property cannot qualify for a wastewater permit of any kind and therefore has no development potential at all and therefore its highest and best use is only for

6

recreation and limited forestry. Mr. Sargeant testified credibly that in determining highest and best use in conjunction with valuing property, it is necessary to consider what uses are 1) legally permissible, 2) physically possible, 3) maximally profitable, and 4) financially feasible. While residential development on this lot *may* be legally permissible, there are legitimate doubts about that because it is not clear that required legal isolation distances for a well and house can be met even if a wastewater permit can be obtained, and money would have to be spent to make that determination. While it is physically possible for development to occur, the significant costs in determining the legal permissibility, with no guarantee of success, cast doubt on whether development represents the maximum profitable use of the property. Similarly, the unknown but significant (if it were to occur) risk of environmental pollution and cleanup costs from a failure of a mounds system make the financial feasibility of development low.

Neither of the highest and best uses advocated by the parties—residential development or vacant forestry land--is supported by the evidence or analysis as a sole highest and best use. The Court finds that the property has some residential development potential but it is low; however, the property is not limited to use as vacant land for recreation and forestry as its sole highest and best use because there is some level of development potential. The Court finds that the highest and best use is a mix of some potential for residential development and vacant land for recreation and forestry, with the development potential being less than 50%--most likely in the range of 30-45%.

*Fair Market Value*

The highest and best use determination drives the determination of fair market value. Here the Court is hampered because neither party introduced evidence based on the highest and best determination that the Court has made. The evidence is that if the highest and best use is solely residential development, the fair market value is $61,000-63,300; if the property cannot be developed, its value is $15,000. The Court rejects both of these extremes based on its determination of mixed highest and best use, yet it has the obligation to determine fair market value based on the evidence.

While it is difficult to determine an exact figure for fair market value under these circumstances, it is possible to establish a value that fairly and reasonably represents fair market value for purposes of equitable assessment for tax purposes in relation to other properties in the Town. Analysis of evidence suggests different approaches to establish a reasonable range.

The first is to start with the evidence that if the highest and best use were residential development alone, with a value of approximately $63,300, and this is reduced to 50% of full development potential value, then the value would be $31,650. The Town may argue that it has already taken a 25% reduction for property characteristics so that under this approach the Appellant would be given the advantage of both the 25% reduction for property characteristics and a 50% reduction for a highest and best use determination that reflects those property characteristics, but this is not unfair since the

7

FILED

JAN 23 2014

VERMONT SUPERIOR COURT
WINDSOR UNIT

most likely percentage for development potential is 30-45%, not 50%. Thus, the $31,650 is probably on the high side.

Moreover, Mr. Leen's opinion of $61,000 did not take into account any reduction for property characteristics. Calculation of 30-45% of his figure results in a range of $18,300 to $27,450.

Another is to start with the Listers' land value of $32,000 per acre for 2 acres and $8,000 for the additional 2 acres and take the .09 reduction to reflect actual sale prices and then take a 50% reduction attributable to the mixed highest and best use, rather than the 25% reduction that the Listers applied, but decline to apply the premium for neighborhood value that the Listers applied. The reason for this is that it would be understandable to apply that premium to a parcel that met the characteristics of the properties that create the high value: large estate properties with significant acreage and amenities and the capacity to construct improvements suitable to a large estate and associate with neighbors with common interests. Those values would not apply to this property. Because of the site and bedroom limitations, the property could not be developed in the same manner as neighboring estate properties; thus it is questionable whether a premium has any relevance to this property, even if it were quantitatively supported by evidence, which it was not. This calculation produces the following: $72,000 less .09 reduction - $65,520 times .5 = $32,760. This is most likely high because the reduction is 50%, which is lower than is warranted by a 30-45% level of development potential.

If a reduction is taken reflecting the 30-45% of development potential, the range is $19,656 ($65,520 times .3 = $19,656) to $29,484 ($65,520 times .45 = $29,484).

Taking all of these approaches into account, the Court determines that a reasonable fair market value for the property is $30,000. This is admittedly inexact, but represents what analysis of the available evidence produces as a fair and reasonable determination of the fair market value of this property.

*Equalization Ratio*

The "common level of appraisal" or CLA for Bridgewater as determined by the Vermont Department of Taxes, Division of Property Valuation and Review for 2012 was 98%. Appellant introduced evidence of a raw computation of assessed value compared with sales prices of all properties in Bridgewater from 2009 through 2012, but this evidence did not distinguish between types of properties or show that it was statistically representative of comparable properties and was not sufficient to overcome Appellant's burden of persuasion on this point. The CLA of 98% applied to the fair market value of $30,000 produces an equalized value for assessment purposes of $29,400.

## Conclusions of Law

The fair market value of a property reflects its "highest and best use." *Scott Const., Inc. v. City of Newport Board of Civil Authority*, 165 Vt. 232, 235 (1996). In determining a property's highest and best use, appraisers must consider its "potential and prospective" uses. 32 V.S.A. § 3481(1). "The highest and best use of property has generally been construed to refer to 'the value of the property for its most profitable, likely, and legal use.' D. Stockford, *Property Tax Assessment of Conservation Easements*, 17 B.C.Envtl.Aff.L.Rev. 823, 827 (1990)." *Scott*, 165 Vt. at 235. Because appraisers must project how a property could be used in the future, the highest-and-best-use analysis depends on market and legal assumptions. *See Zurn v. City of St. Albans*, 2009 VT 85, ¶ 9, 186 Vt. 575.

"When a taxpayer grieves [a tax] assessment to the state appraiser, there is a presumption that the town's assessment is valid." *Vanderminden v. Town of Wells*, 2013 VT 49, ¶ 8, 75 A.3d 598. "This is a bursting bubble presumption; if the taxpayer presents any evidence that his property was appraised above fair market value, then the presumption disappears, and 'it is up to the town to introduce evidence that justifies its appraisal.'" *Id.* (quoting *Adams v. Town of West Haven*, 147 Vt. 618, 620 (1987)). The Court previously ruled that Appellant's evidence was sufficient to overcome the presumption of validity that otherwise attaches to the Town's valuation. Therefore, the Town had the responsibility to present evidence in support of its value. The burden of persuasion remained with Appellant throughout the hearing, and never shifted to the Town. *Kruse v. Town of Westford*, 145 Vt. 368, 371–73 (1985). It became the responsibility of the Court to make a *de novo* determination of both highest and best use and the fair market value of the property. 32 V.S.A. § 4467. The goal is to ensure that property owners pay their fair share of the tax burden based on the potential of their property. *Zurn*, 2009 VT 85, ¶ 9.

The fair market value of a property is defined as "the price which the property will bring in the market when offered for sale and purchased by another, taking into consideration all the elements of the availability of the property, its use both potential and prospective, any functional deficiencies, and all other elements such as age and condition which combine to give property a market value." 32 V.S.A. § 3481(1). "Common sense and practical everyday business experience are [tax appraisers'] best guides" for determining a property's fair market value. *Potter v. Town of Clarendon*, 118 Vt. 278, 281 (1954).

As the Findings of Fact show, Appellant met the burden of persuasion on the issue of highest and best use: Appellant showed that the Town's determination that the highest and best use was solely as a development lot was not supported by the evidence. Therefore, the Court has addressed the issue *de novo* and made its own determination of highest and best use as of April 1, 2012 based on the evidence, specifically the property had a mixed highest and best use: to the extent of 30-45%, there was development potential as a residential lot, but the remaining 55-70% was as undeveloped land for

FILED

JAN 23 2014

VERMONT SUPERIOR COURT
WINDSOR UNIT

recreational and forestry use. This represents the application of "common sense and everyday business experience" to the specific facts of this property.

Based on the determination of a mixed highest and best use in the proportions determined, the Court analyzed the evidence presented and determined that a preponderance of the evidence supported a determination that the fair market value of the property as of April 1, 2012 was $30,000.

Appellant did not overcome the presumption of validity with respect to the Town's equalization ratio, and the Court applied the Town's ratio to determine that the equalized value of the property for the 2012 assessment was $29,400.

Pursuant to 32 V.S.A. § 4468, the fair market value for the property for 2012, 2013, and 2014 is $30,000, subject to other terms of that statute that may affect the 2014 value.

## ORDER

The fair value for Appellants' property for the tax years 2012, 2013, and 2014 is $30,000. The equalized value for the 2012 assessment is $29,400.

Dated at Woodstock, Vermont this 24th day of January, 2014.

Hon. Mary Miles Teachout
Superior Court Judge

FILED

JAN 23 2014

VERMONT SUPERIOR COURT
WINDSOR UNIT